**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **Transtar Industries, LLC,** | **Case No. 1:19cv1230** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **Chadd Lester, et al.,** | |
| **Defendants.** | **MEMORANDUM OF OPINION AND ORDER** |

Currently pending is Plaintiff Transtar Industries, LLC.'s Motion for Temporary Restraining Order and Scheduling of a Preliminary Injunction Hearing. (Doc. No. 30.) Defendants Chadd Lester, Cary Young, Alven Rivera, Seal Aftermarket Products, LLC ("SAP"), and TranzDepot, LLC filed a Brief in Opposition on June 14, 2019, to which Plaintiff replied on June 19, 2019. (Doc. Nos. 11, 18.) A hearing on Plaintiff's Motion was conducted before the undersigned on June 23, 2019. (Doc. No. 32.) For the foregoing reasons, Plaintiff's Motion for TRO and Preliminary Injunction (Doc. No. 30) is DENIED.

**I.  Procedural History**

On May 23, 2019, Plaintiff filed a Complaint in the Cuyahoga County Court of Common Pleas against Defendants asserting state law claims for misappropriation of trade secrets, tortious interference with economic and/or business relations, breach of contract, and injunctive relief. (Doc. No. 1-6.) Several days later, on May 28, 2019, Plaintiff filed Motions for Temporary Restraining Order (Doc. No. 30) and Expedited Discovery (Doc. No. 31.)

Defendants removed the case to this Court on May 29, 2019 on the basis of diversity jurisdiction. (Doc. No. 1.) Plaintiff promptly filed a Motion to Remand, which was denied on June 7, 2019. (Doc. Nos. 3, 7.) Shortly thereafter, Plaintiff filed a second Motion for Expedited Discovery. (Doc No. 9.)

Defendants filed an Answer and Counterclaims on June 14, 2019.[1] (Doc. No. 17.) Plaintiff filed an Answer to Defendants' Counterclaims on June 17, 2019. (Doc. No. 28.)

Meanwhile, the parties submitted briefing regarding Plaintiff's Motions for TRO and Expedited Discovery. Defendants filed a Brief in Opposition to Plaintiff's Motion for TRO on June 14, 2019, to which Plaintiff replied on June 19, 2019. (Doc. Nos. 11, 18.) Both parties submitted numerous declarations in support of their briefing, including the Declarations of Defendants Chadd Lester, Cary Young, and Alven Rivera, and Plaintiff's Vice-President of Sales and Marketing Tom DeMille. (Doc. Nos. 8-1, 12, 13, 14, 15, 16, 18-1.)

On June 19 and 20, 2019, Defendants filed Motions to Strike the Declarations of Mr. DeMille. (Doc. Nos. 20, 22.) The Court ordered Defendants to file a Sur-Reply addressing Mr. DeMille's Declarations and denied Defendants' Motions to Strike as moot. *See* Non-Document Order dated June 24, 2019. Defendants thereafter filed a Sur-Reply on June 26, 2019, as well as additional Declarations of Defendants Lester, Rivera, and Young. (Doc. Nos. 24, 25, 26, 27.)

On June 28, 2019, this matter was reassigned to the undersigned pursuant to General Order 2019-13. The Court subsequently held a status conference with counsel, during which it scheduled

---

[1] Defendants assert Counterclaims for violations of Sections 1 and 2 of the Sherman Act, tortious interference with business relationships, tortious interference with prospective business advantage, unfair competition based upon malicious litigation, punitive damages, and a permanent injunction. (Doc. No. 17.)

a Preliminary Injunction Hearing and denied Plaintiff's Motion for Expedited Discovery (Doc. No. 9) on the grounds Plaintiff had failed to demonstrate good cause. (Doc. No. 29.)

A Preliminary Injunction Hearing was held on July 23, 2019, at which the following witnesses testified: (1) Plaintiff's Vice President of Sales and Marketing, Tom DeMille; (2) Defendant Lester; (3) Defendant Rivera; (4) Defendant Young; and (5) Plaintiff's Vice-President, North Region, Jason Ganim. (Doc. No. 32.) Numerous exhibits were offered into evidence. (*Id.*) The only objection raised was to the admission of Plaintiff's Exhibit 3, which consisted of a Non-Competition, Non-Disclosure, Non-Solicitation, and Confidentiality Agreement signed by Defendant Lester and dated March 31, 2012 (hereinafter "March 2012 Lester Agreement."). Defendants objected to this exhibit on the basis that the March 2012 Lester Agreement was allegedly superseded by a subsequent Non-Competition, Non-Disclosure, Non-Solicitation, and Confidentiality Agreement between Plaintiff and Defendant Lester. Mr. Lester testified at the hearing that he remembered signing this alleged subsequent Agreement but did not have a signed copy in his possession. Plaintiff indicated it was not aware of any signed employment agreement between itself and Lester other than the March 2012 Lester Agreement.

At the conclusion of the hearing, the Court ordered Plaintiff to conduct a diligent search of its records for any and all Non-Compete Agreements between Lester and Transtar dated subsequent to the March 2012 Lester Agreement. (Doc. No. 33.) The Court also ordered Defendant Lester to consult with his former and current counsel to determine whether a signed copy of the alleged Non-Compete referenced in his hearing testimony could be located. (*Id.*) The parties were ordered to submit status reports regarding these issues by no later than July 30, 2019. (*Id.*)

3

The parties timely filed their Status Reports. (Doc. Nos. 34, 35.) Neither Plaintiff nor Defendant Lester were able to produce a signed copy of any Non-Compete Agreement between the two dated subsequent to the March 2012 Lester Agreement. (*Id*) Defendant Lester, however, provided correspondence that he argues demonstrates that he did, in fact, sign a non-competition agreement with Plaintiff in May 2012. (Doc. No. 34-1.)

## II. Summary of Facts

Plaintiff Transtar is a distributor and kit packager of transmission parts and components, selling primarily to transmission repair and specialty shops. In 2012, Plaintiff purchased the assets and lease for a new Detroit area branch located at 654 E. 10 Mile Road, Hazel Park, Michigan (hereinafter "the Hazel Park location"). As part of this asset purchase, Defendant Chadd Lester was hired by Plaintiff as a Regional Manager.

On March 31, 2012, Lester entered into a Non-Competition, Non-Disclosure, Non-Solicitation and Confidentiality Agreement with Plaintiff. Among other things, the March 2012 Agreement required Lester to keep certain information confidential "during and after [his] employment by the Employer until such time as such Confidential Information has become public knowledge, other than as a result of [his] breach of this Agreement or breach by those acting in concert with [him] or on [his] behalf." (Doc. No. 1-7 at PageID# 156-157.) In addition, this Agreement contained the following non-competition and non-solicitation provision:

> Employee agrees that during the term of Employee's employment with Transtar and for a period of twelve (12) months to run consecutively, beginning on the last day of Employee's employment with Transtar, for any reason or no reason and whether employment is terminated at the option of Employee of Transtar (the "Noncompete Period"), Employee shall not directly or indirectly, participate or engage in any activity in which the Employee contributes Employee's knowledge, directly or indirectly, in whole or in part . . . to an entity engaged in any

4

> business or enterprise identical to or substantially the same as the Business, and which is located within 100 miles of the Transtar Location from which Employee's employment was based or within Employee's assigned territory or geographic region, whichever is greater ("Prohibited Activity"). Prohibited Activity also includes activity that may require or inevitably require Employee's disclosure of trade secrets, proprietary information or Confidential Information.

(*Id.* at PageID# 157)[2]

While the parties dispute the circumstances surrounding the end of Lester's employment with Transtar,[3] it is undisputed that he ceased working for Transtar in August 2015. In January 2016, Lester was hired by Defendant SAP. He subsequently acquired another transmission parts company, A&Reds, with a business partner, Troy Eakins.

In late 2018, Transtar made the business decision to move its Detroit Branch out of the Hazel Park location to a different facility several miles away. According to the landlord of the Hazel Park location, Howard Tenebaum, he was notified by Transtar on October 22, 2018 that it was planning to relocate its branch and would not be exercising its option to renew its lease on the Hazel Park location. Mr. Tenebaum wanted to find a replacement tenant as soon as possible and reached out to Defendant Lester to inquire if his employer was interested in leasing the property.

In January 2019, Lester and Mr. Eakins decided to expand A&Reds into the Michigan and Ohio markets and began lease negotiations with Mr. Tenebaum. On March 27, 2019, Lester and

---

[2] As noted *supra*, Lester claims he and Transtar entered into a subsequent agreement in May 2012, an unsigned copy of which has been provided to the Court. (Doc. No. 34-1.) The Court notes that the alleged May 2012 Agreement contains the same confidentiality and non-competition provisions as the March 2012 Agreement. Thus, for purposes of resolving the instant Motion, the Court need not decide which of the two Agreements is binding as they contain identical provisions with regard to the issues that are relevant to Plaintiff's Motion.

[3] The parties strenuously dispute whether Defendant Lester resigned or was terminated from his position at Transtar. This issue is not relevant, however, to whether a preliminary injunction is warranted.

Eakins formed Defendant TranzDepot as a subsidiary of A&Reds. Shortly thereafter, TranzDepot entered into an agreement to lease the Hazel Park location.

Around that same time period, several Transtar employees were offered employment with TranzDepot, including Defendants Rivera and Young.[4] Defendants Rivera and Young had worked as salesmen for Transtar from 1994 and 1995 (respectively) until leaving to join TranzDepot in May 2019. Both had been based out of Transtar's Chicago branch.

It is undisputed that neither Rivera or Young entered into non-competition agreements with Transtar. They did, however, enter into Confidentiality and Trade Secret Agreements with Transtar, which provided (in relevant part) as follows:

> The Employee understands and acknowledges that in the course of employment with Transtar, the Employee may obtain and or develop information related to the Business including, but not limited to, potential customer lists, customer records, price lists, policy manuals, business contracts, marketing plans and strategy, methods of doing business, special customer needs and future plans, selling techniques, financial data, employee records, computer systems information and procedures, trade secrets, product development, research, new technology, vendor sources and other confidential information related to the Business that is not generally known to the public (collectively referred to in this Agreement as "Confidential Information"). This information is regarded as sensitive and may directly or indirectly affect Transtar's interests. The Employee agrees not to disclose any such Confidential Information to any non-Transtar personnel, or other entity or person in any manner whatsoever. The employee agrees not to use such Confidential Information for the Employee's personal benefit or in any manner other than for the exclusive benefit of Transtar and shall keep all information Confidential both during and after the Employee's employment with Transtar or any of it's affiliates or subsidiaries.

(Doc. No. 1-7 at PageID#s 107, 111.)

---

[4] Plaintiff alleges a number of other Transtar employees were also offered employment by Defendant Lester, including Marc Campbell, Wayne Jacob, and Martha Rodriguez. (Doc. No. 8-1.) Each of these employees declined.

Both Rivera and Young testified that they were not solicited, recruited, or hired away from Transtar by Lester, SAP, or TranzDepot. Rather, Rivera and Young each submitted lengthy Declarations in which they recounted numerous reasons for deciding to seek employment with TranzDepot. (Doc. Nos. 12, 15.) In addition, both Rivera and Young testified they received substantial raises at TranzDepot.[5]

As of the date of the hearing, TranzDepot had been in operation at the Hazel Park location for two months. Mr. DeMille testified that, during that time period, Plaintiff's Detroit sales have been down approximately $10,000 per day. Of that amount, Mr. DeMille testified that approximately $4,500 per day is attributable to losses associated with Rivera's customers.

## III.  Standard of Review

When considering a motion for preliminary injunction, the Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *See National Credit Union Administration Board v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). *See also Palmer v. Harris*, 2018 WL 6062305 at *6 (N.D. Ohio Nov. 20, 2018). These factors should be balanced against each other but are "not prerequisites that must be met." *In*

---

[5] Mr. DeMille testified at the hearing that, for the year 2018, Rivera's annual salary at Transtar was approximately $100,000-110,000 and Young's annual salary was $65,000-70,000. Rivera testified that his salary at TranzDepot is guaranteed at $165,000 for the next two years, while Young testified his salary at TranzDepot is guaranteed at $105,000 for the next two years.

7

*re Delorean Motor Co*., 755 F.2d 1223, 1229 (6th Cir. 1985). *See also Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D. Ohio 2013).

A party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

### IV.  Analysis

In its Motion, Plaintiff seeks an injunction preventing Defendants "from using or disclosing Transtar's trade secrets." (Doc. No. 1-7 at 1.) Plaintiff asserts Defendants have utilized Lester's knowledge of Transtar's trade secrets to "target a location for SAP's Michigan branch," raid Transtar employees, and solicit Transtar's customers. (*Id.*) Plaintiff further maintains that, by employing former Transtar employees in substantially similar positions at TranzDepot, it is inevitable that Defendants will improperly use Plaintiff's trade secrets, including its customer information, pricing, business strategy, sales revenue, and employee information and performance. (*Id.* at 14-18.) Plaintiff argues it is likely to be successful on the merits with respect to its state law claims and maintains it will be severely harmed if a preliminary injunction is not granted. (*Id*. at 15-21.)

Defendants maintain injunctive relief is not warranted because "Plaintiff failed to establish the unauthorized use or disclosure of any of its actual trade secrets." (Doc. No. 11 at 15.) They argue that much of the information identified by Plaintiff as trade secrets (such as customer location, employee performance, knowledge of which Transtar employees had non-competes, etc.)

8

does not constitute a "trade secret" as a matter of law because it is readily ascertainable by other means. With regard to information regarding Plaintiff's pricing, delivery routes, vendor, and inventory information, Defendants argue they are using their own specially designed software for this information and not relying on any knowledge of Plaintiff's business operations. Finally, Defendants strongly dispute Plaintiff's allegations that they "raided" Transtar employees, noting that both Rivera and Young contacted Lester about the possibility of employment (and not the other way around). Defendants also emphasize that Lester left his position at Transtar four years ago in August 2015, arguing his non-competition agreement is therefore well expired and any "trade secret" knowledge he might have had is now stale.

The Court will address the parties' arguments in the context of the four factors, set forth *supra*.

### 1. Likelihood of Success on the Merits

As noted above, Plaintiff asserts claims for (1) misappropriation of trade secrets under the Ohio Trade Secrets Act; (2) breach of contract with respect to the Confidentiality Agreements entered into by Defendants Lester, Rivera, and Young; and (3) tortious interference with economic and/or business relations. (Doc. No. 1-6.)

In order to prevail on a misappropriation of trade secrets claim under the Ohio Uniform Trade Secrets Act, a plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *See Tomaydo-Tomahdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio App. 8th Dist. 2017). *See also Goken America, LLC v. Bandepalya*, 2014 WL 6673830 at * 5 (S.D. Ohio Nov. 24, 2014). To qualify as a trade secret under the first prong, information must: (1) derive its value from being

9

generally not known nor readily ascertainable by others who could derive value from it; and (2) be the subject of reasonable efforts to maintain its secrecy. Ohio Rev. Code § 1333.61(D). The Ohio Supreme Court also adopted a number of factors to analyze whether information rises to the level of trade secret:

> (1) the extent to which the information is known outside the business;
>
> (2) the extent to which it is known to those inside the business, i.e., by the employees;
>
> (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;
>
> (4) the savings effected and the value to the holder in having the information as against competitors;
>
> (5) the amount of effort or money expended in obtaining and developing the information; and
>
> (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*See State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 732 N.E.2d 373, 378 (2000). *See also Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 414, 49 N.E.2d 1296, 1302 (2016).

Here, Plaintiff argues that its trade secrets include customer lists, pricing, inventory, and delivery routes. (Doc. No. 18 at 12.) Plaintiff also asserts that certain information regarding its employees constitutes trade secrets, including the sales revenues and profits for each employee, employee cell phone numbers, and knowledge regarding which employees signed non-competition agreements and which employees have special skills such as the ability to speak Spanish. (Doc. No. 1-7.)

For the following reasons, the Court finds Plaintiff has failed to demonstrate a likelihood of success on the merits with respect to its trade secret claim. As an initial matter, much of the

information identified by Plaintiff as a "trade secret" is not confidential in nature and, in many instances, is publicly available. For example, with regard to their sales revenues and profits, both Rivera and Young testified that Plaintiff presented them with plaques containing this specific information and stated that these plaques were hung on the walls of the Transtar office and "were visible to anyone who came to the office, including customers, vendors, and delivery persons." (Doc. No. 26 at ¶ 3.) Rivera further averred that "when I resigned, they let me take these awards with me." (*Id.*) Young also testified that he had been to many trade shows and seminars where Plaintiff publicly announced his sales revenues in front of vendors and customers.

Moreover, with regard to Plaintiff's employee's cell phone numbers, it is not disputed that Plaintiff's employees used their personal cell phone numbers to make business calls for Transtar. Evidence was adduced at the hearing that such personal cell phone numbers are publicly available and, in fact, shared widely with family and friends. Likewise, information regarding an employee's ability to speak Spanish is, clearly, not confidential. Finally, Plaintiff has not cited any authority demonstrating that Lester's alleged knowledge of which Transtar employees had non-competition agreements, constitutes a "trade secret" under Ohio law.

With regard to Plaintiff's customer lists, pricing, inventory, and delivery routes, the Court is similarly not persuaded that this information constitutes confidential, trade secret information. Testimony was introduced at the hearing that potential customers and delivery routes in the transmission parts industry are readily ascertainable through publicly available websites such as Google. Moreover, both Lester, Rivera, and Young credibly testified that pricing information is widely shared, including by customers seeking to negotiate a better deal. *See e.g,* Doc. No. 25 at ¶ 13. Rivera and Young also explained that, in their many years of experience, customers in this

particular industry do not have predictable, stable buying patterns but, rather, are simply looking for whatever part they need based on "what comes in the door." Thus, based on the evidence presented, the Court is not convinced Plaintiff's customer lists, pricing, inventory, and delivery routes constitute confidential "trade secrets."

Even assuming, however, that this information did constitute confidential trade secret information, the Court finds Plaintiff has failed to demonstrate, at this stage in the proceedings, that Defendants are improperly using this information. Among other things, Defendant Lester averred that "TranzDepot was set up using a system that is already in place at NatPro. The NatPro System contained its own vendor information, price structure, and inventory developed independently from Transtar and which was uploaded for use in TranzDepot." (Doc. No. 25 at ¶ 10.) Lester further stated that "in determining customer needs I used, for example, NatPro's data, vendor information, part numbering, and infrastructure in the set-up process for TranzDepot." (*Id.* at ¶ 12.) He also explained that TranzDepot set its own prices based on information provided by NatPro, A&Reds, and their affiliates. (*Id.* at ¶ 13.) Lester, Rivera, and Young each testified during the hearing that they relied on TranzDepot's own system for tracking customer needs, prices, and inventory, rather than using information they obtained while working at Transtar. The Court found Defendants' testimony in this regard to be credible.[6]

The Court also rejects Plaintiff's arguments that Defendants improperly "targeted" the Hazel Park location and "raided" Transtar employees. Howard Tenebaum, the landlord of the

---

[6] The Court also notes that Lester's employment with Transtar ended four years ago, in August 2015. Plaintiff has failed to demonstrate that the customer, pricing, inventory and/or delivery route information Lester had access to four years ago is still relevant at this time. Courts have declined to impose injunctive relief where information a former employee might have known would have been outdated at the time of the injunction hearing. *See e.g. Jacono v. Invacare Corp.*, 2006 WL 832451 at * 5-6 (Ohio App. 8th Dist. March 30, 2006).

12

Hazel Park location, submitted a Declaration indicating that he decided to reach out to Lester after Transtar notified him that it would not renew its lease. (Doc. No. 14 at ¶ 9.) Moreover, both Rivera and Young submitted Declarations, and testified at the hearing, that Defendants did not solicit or recruit them for positions at TranzDepot. Rather, Rivera and Young indicated they were unhappy at Transtar for a variety of reasons and reached out to Lester because they were "sick and tired of being mistreated at Transtar." (Doc. No. 12 at ¶ 7- 16; Doc. No. 15 at ¶ 5-12.) The Court finds this evidence credible and, thus, concludes that Plaintiff's claim that Defendants improperly raided their previous location and employees is not supported by the record at this time.

In addition, the Court rejects Plaintiff's reliance on the "inevitable disclosure" doctrine. Under that doctrine, injunctive relief may be warranted if a threat of harm through disclosure of trade secrets "can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 747 N.E.2d 268, 279 (2000) (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.1995)). *See also Avery Dennison Corp.*, 924 F.Supp.2d at 899. Here, as discussed above, Plaintiff has failed to demonstrate that its customers, pricing, inventory, delivery routes, employee information, etc., constitute confidential information and/or trade secrets. Thus, the Court finds Plaintiff's reliance on the inevitable disclosure doctrine to be misplaced.

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits with respect to its trade secret claim.

With regard to Plaintiff's claims for breach of contract and tortious interference with business relations, these claims are also premised on the allegation that Defendants misused Plaintiff's confidential business information. As set forth at length above, the Court finds that, at this stage of the proceedings, Plaintiff has failed to demonstrate that Defendants improperly used its confidential business information. The Court therefore finds that Plaintiff has failed to demonstrate a likelihood of success on its breach of contract claims premised on the Confidentiality Agreements at issue. Nor has Plaintiff demonstrated a likelihood of success on the merits on its claims that Defendants improperly used confidential information to intentionally and maliciously interfere with Plaintiff's business relationships.

Accordingly, the Court finds this factor weighs heavily against awarding injunctive relief.

**2.      Irreparable Injury**

The second factor in weighing whether to grant a preliminary injunction is whether the movant would suffer irreparable injury without an injunction. The key word in determining the extent of an injury sufficient to support the award of injunctive relief is "irreparable." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.1991). *See also Hudson v. Caruso*, 748 F.Supp.2d 721, 725 (W.D. Mich. Sept. 14, 2010). Mere injuries, however substantial, are not enough. *Michigan Coalition of Radioactive Material Users, Inc*., 945 F.2d at 154. Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id. See also NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc*., 246 Fed. Appx. 929, 943 (6th Cir. 2007); *Hunt v. Mohr*, 2011 WL 4467764 at * 3 (S.D. Ohio Sept. 26, 2011).

Here, Plaintiff argues it "will be substantially and irreparably harmed if SAP/TranzDepot use the information developed over years by Transtar to usurp Transtar's Detroit market position." (Doc. No. 1-7 at 20.) During the hearing, Plaintiff's Vice-President Tom DeMille testified that, since TranzDepot began operations at the Hazel Park location two months ago, Plaintiff's Detroit sales have been down approximately $10,000 per day.

The Court finds this factor does not weigh in favor of awarding injunctive relief. As discussed above, Plaintiff has not demonstrated that Defendants are, in fact, using Plaintiff's confidential information to develop its TranzDepot Detroit business. Thus, while Plaintiff may have experienced a loss in sales since TranzDepot opened at the Hazel Park location, it has not demonstrated at this stage of the proceedings that this injury is due to any unlawful actions on the part of Defendants.

### 3. Substantial Harm to Others

The third factor is whether the issuance of an injunction would cause substantial harm to others. Here, the Court finds Defendants may be substantially harmed if the Court were to award the injunctive relief sought by Plaintiff. Among other things, Plaintiff seeks an Order "requiring SAP and/or TranzDepot to cease employing" Defendants Lester, Rivera, and Young. (Doc. No. 1-7 at 17.) As noted above, neither Defendants Rivera or Young signed a non-competition agreement with Plaintiff, and Lester's non-competition agreement expired nearly three years ago. Moreover, Plaintiff has failed, at this stage in the proceedings, to demonstrate that Lester improperly solicited Transtar employees or that any of these Defendants improperly used Transtar's confidential trade secret information.

In light of the above, the Court finds that depriving Defendants Lester, Rivera, and Young of their employment would be wholly inappropriate and would cause these Defendants substantial harm. The Court further finds it would cause substantial harm to Defendants SAP and TranzDepot to lose the services and experience of these employees pending the duration of this lawsuit.

Accordingly, the Court finds this factor weighs heavily against awarding injunctive relief.

### 4. The Public Interest

The fourth, and final, factor is whether the public interest would be served by the injunction. Given the Plaintiff's failure to demonstrate that Defendants used its confidential trade secret information, the Court finds the public interest would not be served by awarding injunctive relief.

## V. Conclusion

A preliminary injunction is an extraordinary remedy and will only be granted if the moving party carries its burden of showing that such extraordinary relief is warranted. *See Overstreet*, 305 F.3d at 573. After weighing all four factors, the Court concludes Plaintiff has not established that injunctive relief is warranted. Plaintiff's Motion for TRO and Preliminary Injunction (Doc. No. 30) is, therefore, DENIED.[7]

**IT IS SO ORDERED.**

                                            *s/Pamela A. Barker*
                                        PAMELA A. BARKER
Date: July 31, 2019                      U. S. DISTRICT JUDGE

---

[7] In addition, Plaintiff's first Motion for Expedited Discovery, which was filed in state court prior to removal and docketed herein as Doc. No. 31, is DENIED on the grounds Plaintiff failed to show good cause.